Case 18-3406 and 18-3407, Evanston Insurance Company v. Certified Steel Stud Association Inc. Argument not to exceed 20 minutes per side, with 10 minutes for each appellant. Mr. Lemke, you may proceed for the first appellant when you are ready. May it please the Court, I am Raymond Lemke. I represent the Certified Steel Stud Association Inc., which has typically been referred to throughout this case by its initials, CSSA, and I will use that reference today. We are the appellant in 3406. We were the defendant in the District Court. We are appealing a summary judgment in favor of plaintiff, Evanston Insurance Company. The issue in this case concerns whether a liability insurance policy, which Evanston sold to the CSSA, provides indemnification for a $43 million judgment that was rendered against the CSSA in the Butler County, Ohio, Court of Common Pleas. The State Court judgment, and this is somewhat important, the State Court judgment in favor of the other appellant, Clark Western Dietrich Building Systems LLC, which has typically been referred to as Clark Dietrich, was for four claims. Violation of Ohio City Trade Practices Act slash unfair competition, the State Court treated that as a single claim. Defamation, product disparagement, civil conspiracy. This all arose out of some publications that the CSSA and some of its member companies had made about some Clark Dietrich products. Evanston, the insurance company, had three theories as to why there was no coverage. However, the District Court based its decision on one of them, that the claims were excluded under an exclusion of the policy. The relevant language in the exclusion says the policy does not provide indemnification for, quote, any dishonest, deliberately fraudulent, or criminal act, omission, personal injury, or publisher's liability. The District Court went through and said, well, on the substantive claims in the State Court Act, the unfair competition, defamation, disparagement, this wouldn't necessarily exclude coverage. However, the District Court looked at the civil conspiracy claim and determined that because the jury was required to find intent to find liability for civil conspiracy, that therefore that brought the entire case underneath this exclusion for dishonest conduct. Go ahead, Judge Seiler. Do you have a real good case that you're depending upon, or just in the general looking at the insurance policy? Your Honor, I don't think there is a single case. This is kind of an odd situation. I don't think you're going to find one case that is controlling or completely on all fours with this situation. The question really becomes, what is the meaning of that exclusion? It's not defined. And what's the meaning of dishonest? It's not defined in the policy. Ohio law, which is what this case was decided under. I'm sorry, Your Honor. Ohio law, which is what this case was decided under, says if a term in an insurance policy is not defined, you go to the plain English meeting. I want to get you there, but I just want to make sure I'm understanding the stakes of the case. So this is a deck action. And am I right that the coverage, is it $3 million that we're talking about is the max that is relevant to this dispute? Or what is it? Well, there is some question about that that frankly was not resolved below, Your Honor. Is it $3 million under the aggregate limit, or is it $1 million under the per claim limit? But there's another factor that enters in there is that this was a, what I've always been told you call a wasting policy. In other words, the money spent on defense by the insurer is applied against the monetary limit of coverage. And the insurer did provide a defense in the state court action. So I do not know the exact number, but it is fair to believe that whatever the original limit of coverage was, that has been substantially diminished by the insurer's payments for the CSSA's defense, both in the state trial court and through the state appellate system. The reason I ask the question is just making sure we're deciding no more than we have to decide in this case. So from your perspective, you don't want the verdict below to stand, I assume. I don't think you need help on that. What's the narrowest path to victory that we have to consider from your perspective? From my perspective, Your Honor, the narrowest path to victory is to simply say that we don't know, because the only thing we have about the conduct that the CSSA was held liable for, which is what you would look at to determine whether or not this policy exclusion applies. The only thing we have is the jury's verdict from Butler County, the jury's answers to the interrogatories, and the trial court's instructions to the juries telling them what they needed to find to get to that verdict. All of those things, if you read them and they're in the record, allowed the jury to get to where it got to based on alternative findings. They could have found knowledge of falsity. They could have found reckless disregard defined in the instructions as publication while you entertain serious doubt, which is certainly something less than actual knowledge of falsity. We don't know which of those alternative findings the jury actually made. Well, they found that there was a civil conspiracy, did they not, and that's what the trial court based it on primarily? Yes, Your Honor, they did find that there was a civil conspiracy, but remember under the instructions that the jury was given in Butler County, all they had to find for purposes of civil conspiracy was a, quote, malicious combination, which was defined as an act, the intention to do a wrongful act. The wrongful acts were the unfair competition, the defamation, the product disparagement. Any of those, well, the unfair competition instructions didn't require the jury to make any findings about the mental state of the CSSA with regard to the truth or falsehood. What's your punchline on this point? Is your punchline that no one knows, so we're going to what, have new interrogatories for that jury, or we're going to have a new trial, or what are we? The punchline, Your Honor, is that we don't know. This was a summary judgment. The record is not sufficient to say. But how do you anticipate learning this given that the case is over and the jurors have gone back to their? Well, at this point, Your Honor, we may not be able to learn that, but that really, representing the insurer, that really wasn't my burden. The question is going to be, did the insurer prove that the exclusion applied? You certainly can't say that. So your punchline is if you don't know, you win? Yeah. I mean, this is summary judgment. They have to show that there's no genuine issue of material fact, and they're entitled to judgment as a matter of law. But that's where you, now you confuse it again for me. Do you win as a matter of law, or do you, oh, it's summary judgment, so you make it sound like we're going to send it back to Judge Barrett and do some more fact development. Is that what you're implying? That is a possibility, Your Honor. What would the fact, I don't understand what that fact development would look like. What more is there to gather other than talking to the jurors themselves? What more is there to gather other than the instructions in the verdict? In truth, Your Honor, at this point, there isn't anything more to gather. Do you believe the court could say that as a matter of law, this record is inadequate and the insurer loses? I didn't think there was any other possibility. I mean, I didn't feel like the summary judgment standard was needed. I didn't think it was here or there. I just didn't think it had anything to do with the case at this point. I don't see a fact trial going forward. I think it's relevant, Your Honor, in the sense that if we don't know whether or not, the record doesn't permit us to determine whether or not the particular governing standard was met, here whether or not this exclusion applies, then summary judgment becomes the default who wins, who loses rule principle. And at that point, who had the burden of proof in the case? CSSA did not. The insurer did. So if the insurer has not put forth a sufficient record to say, yeah, this exclusion applies, and that record, we do not have that record because we don't know specifically what the jury found. Why not send it back to the district court to have a finding either by the court or by a jury on this issue? If you say summary judgment was improper, that has to be decided whether it's a dishonest act, right? I think this court could do that. I don't think it's necessary because I don't think this record is going to, I don't think there's anything more that's going to go into the record if it goes back. We did not ask for summary judgment below. So having not made that motion in the district court, I'm reluctant to ask this court to, in effect, give me summary judgment. I think the court could do that. I have no reason to believe that there's going to be any more information come into this record. But this record, I respectfully submit, is inadequate to support the decision that this policy does not cover. And your main point on that front is just because you utter a false statement intentionally doesn't mean you were intentional as to do its falsity. Is that boiling down your point? Not quite, Your Honor. You intentionally utter a statement. It's dishonest if you know that statement's false. But if you are careless, reckless in this instance about whether or not that statement's true or false, which is a finding that the state court jury could have made under these instructions, then that's not dishonest. Dishonest, the definitions that we cite in the brief, it's a disposition to lie, cheat, steal. That connotes a conscious sort of malicious wrongdoing that this jury in Butler County did not have to find to render its verdict. Are you talking about all the counts? Yes, Your Honor. There was nothing in the instructions on unfair competition that required them to find anything about the CSA's mental state regarding truthfulness. So the two counts where it really comes into play are defamation and disparagement. And the instruction they were given on both allowed the jury to find for Clark Dietrich if they concluded that publication was made while the CSA entertained serious doubts, was the phrase in the instruction. That's not dishonest. And then your construction of the verdict on the conspiracy count is? The jury only needed to find that they intentionally did the wrongful act. The wrongful act being publishing something while you entertain serious doubts about its truthfulness. That doesn't get you to dishonesty. And I am out of time. I just want to make one point. Remember, we're talking about an insurance policy. And the rule on exclusions in insurance policies are you only apply the exclusion if it clearly applies. I think we got that. All right, thank you. Thank you, Your Honors. Good morning, Your Honors. May it please the Court, my name is Anthony Sillow, and I represent the appellant in Clark Western Dietrich Building Systems. I'd like to begin by responding to the question, what is the narrowest path for a decision? And I submit the narrowest path is to focus on the ODTPA claim. The damages awarded on that claim were $3.5 million. Whether or not you apply the $1 million per claim limit or the $3 million aggregate limit, the finding for coverage on the ODTPA claim would exhaust the policy. So the only thing that really matters is whether or not the damages awarded on the ODTPA claim are covered by insurance. Now, I submit to you that if that were the only verdict rendered by the jury, it clearly would be covered. So thank you for that clarifying point. Are you with your friend on your side of the case when it comes to the summary judgment point? And he made the point candidly, which was helpful, that they didn't move for summary judgment. So now I'm understanding why he's not asking for a ruling as a matter of law. Where are you on that point? We did move for summary judgment. We moved for essentially a declaration that this exclusion does not bar coverage for the ODTPA claim. And the reason we made that argument, Your Honor, is because you can't tell from these jury interrogatories what wrongful acts were used by the jury for each of the four verdicts. And I submit to you, if you can't make that determination, there's no basis to take the civil conspiracy verdict and impute some kind of an intent back to the ODTPA. Well, the basis that they claim is that the underlying acts which were necessary for the conclusion that there was a conspiracy were themselves the acts that you're now relying on. So it tells us more than the verdict on those counts. But that cannot be the case, Your Honor, because as a result of the trial court's instruction in the Disparagement Act case, that the jury could not award duplicate damages. By virtue of that instruction, which the jury is presumed to have followed, each damage award had to have been based on different false statements and different conduct. An example would show this best, Your Honor. The CSSA publication, which was the only thing that the first three claims were based on, contained nine or ten different statements that we allege to be false. The jury could have determined that any one of those statements gave rise to the ODTPA verdict. Then the jury considered defamation. And the jury awarded actually $10 million, which was reduced for that one false statement. Then the jury goes to defamation. The jury found again that there was liability that had to have been based on one of the other nine statements because the jury couldn't award duplicate damages. Same thing for the third cause of action. Then we get to the civil conspiracy. Civil conspiracy is radically different for one reason. The jury was allowed to consider two other publications. One was a tech note. I want to ask you a question related to that because I'm confused by it. I don't understand how this works. You introduce two other publications into the instruction. And the jury is told, consider those, all three, and consider all of the original defendants. And then they're given the conspiracy instruction, but they identify the first three counts as the underlying activity. So how could it possibly be related to one of those other publications? Here's the reason, Your Honor. There's a distinction between the underlying wrongful acts, each individual false statement, and the tort liability, which attaches to them. The only thing the jury determined on the first three causes of action was that there was some kind of a wrongful act. We don't know what it is because the jury didn't tell us. Some kind of what? Wrongful act, which gave rise to ODTPA liability, defamation liability, and common law disparagement liability. We don't know which of the nine statements the jury relied on for those three findings. Then they go to— Why not send it back down and let a jury determine that, or the court, if you want the court— Because, Your Honor, the burden of proving the applicability of the exclusion was on the insurance company. We moved for cross-summary judgment because they failed to meet their burden. If you conclude that you cannot tell from the jury interrogatories what underlying wrongful acts were involved, they simply have failed to meet their burden. That was a decision they made. They decided to rely exclusively on the jury interrogatories. If the jury interrogatories do not get them there, they flat out lose, and the case should be remanded with an instruction the judgment be entered in favor of Clark Dietrich, and that the court decide what amount of damages should be awarded. To get back to your double damages prohibition point, I'm not sure I get either. Maybe I'm having the same problem Judge White's having with it. So, I mean, just think of one claim and then the conspiracy. If you have an additional element that satisfies conspiracy, that's not violating the prohibition of double damages. It's damages for a freestanding claim. But it is, Your Honor, because when the jury awarded $10 million on the ODTPA claim, they had to award all of the damages caused to Clark Dietrich by whatever false statement they determined to be actionable. When you get to the civil conspiracy count, they cannot use any part of that $10 million for the civil conspiracy claim. So the civil conspiracy claim had to have been based on something other than that. What's the case that makes your point? Because you have a lot of conviction in saying it. I have a lot of conviction in my head that it's wrong. What's the case that illustrates what you're saying is right? The case that I would rely on most would be the Lumberman's case, which says that what the district court needs to do is it needs to focus on each and every claim separately to determine whether or not there is coverage. What the district court did here was it acknowledged that there would have been coverage for the first three damages award, but it said that because there's civil conspiracy, that vitiates coverage for all the other awards. And here's perhaps the best way to show this. Just to make sure I'm getting this, you think this is a better argument than the argument about recklessness versus knowing falsity? It gets back to your point. What is the most narrowest path of decision? You're emphasizing this. That's why I'm asking you. I am, Your Honor. This is the better one. This is the better one because if you conclude that you cannot use the civil conspiracy findings to impute dishonesty to the ODTPA finding, you don't even have to consider whether or not there was dishonest conduct in the civil conspiracy case. You don't get there because the imputation never works. I agree with my co-counsel that dishonesty, that given the instructions, there was no dishonesty with respect to the civil conspiracy claim, but I submit to the court it need not decide that case because the imputation itself was wrong. The court should not – You're saying set aside the civil conspiracy and say that on this first claim that they brought back a verdict and it fits what the coverage is. You don't pay any attention to the civil conspiracy. Correct. That's what you're saying. That's what I'm saying. That's why I started by saying if that had been the only verdict, there would be coverage because the ODTPA claim is a non-intentional tort. We had no obligation to prove ill will, malice, recklessness, anything, and there was no finding of that. The jury made no finding of any kind of culpable mental state with respect to the ODTPA claim. That's why I emphasize you have to look at each one separately. I'm sorry. I have several questions for you. You need to establish certain things to establish each particular claim. So you have a situation where you establish your first claim, but then you decide for whatever reason you want four claims. And the answers to the questions regarding those other claims provide more information. And some of the information that was provided had a higher standard of culpability. And you're saying that you ignore that for the claim that doesn't require that culpability. But if we know that the jury made a specific finding and it's the same acts that are leading to the liability, I'm not sure how you carve that out. Now, in your brief, I think you were trying to say that they really are different acts because the first count was about the product and the second count was about the company. And I'm not sure where you put the third count. So my first question is, I think that that was in the instruction, but I'm asking you. But then you get to the fourth count, and you still didn't answer my question. In your brief, you want to draw a distinction because there was another publication that was mentioned. But I do not see how that publication, I don't understand that instruction. I mean, how do you bring that instruction in and then tell the jury that the only thing that they can rely on is the conduct in the first three counts? Here's how, Your Honor. The tech note, the other publication, was always part of the case. When we pleaded the case, we alleged that that too constituted a violation of the ODTPA. The jury heard all kinds of evidence throughout the trial that the tech note was actionable. It contained false and misleading statements. A week before the case goes to the jury, all of the member companies had settled out, and the trial court entered a judgment on the tech note claim against the CSSA. Because the tech note had been published by someone else. But the jury heard about the tech note throughout the entire trial. You can read that last civil conspiracy verdict as the jury determining that there was an unlawful conspiracy to publish the tech note, which caused damages to Clark Dietrich. That's a rational interpretation. We laid out in our brief all of the evidence that supports that. The $19.5 million awarded on the civil conspiracy count arguably was for future damages for that publication. And how does that mesh with the answer to the interrogatory itself? Because the answer to the interrogatory is what is the wrongful act? It's defamation, it's ODTPA violation, it's common law disparagement. The jury could have determined, as we argued throughout the entire case, that the false statements in the tech note gave rise to defamation, they gave rise to ODTPA violation, and they gave rise to common law disparagement. So again, all the jury did was identify the legal theories. It did not identify the underlying wrongful conduct, which could have been the publication of the tech note. But is that what it did? I thought that the interrogatory said that it was based on the conduct in those counts. The jury instruction was that the jury could consider the allegations in the three counts. The counts were, at least initially, including the tech note. And it said the jury could consider the claims. Well, we had made claims all along that the tech note was a violation of the ODTPA and defamation. And so what I'm submitting is that when the jury checked the boxes that whatever wrongful act, and again, we don't know what wrongful act. I mean, for a conspiracy you have to have a wrongful act, but we don't know what it is. It could well be the publication of the tech note. All the jury decided was that wrongful act was an ODTPA violation, it was defamation, and it was disparagement. And so the point I guess I'm struggling to make is that if you conclude, as I do, that you can't tell what wrongful acts underlie any of these four verdicts, then they cannot prevail on their burden of proof because you can't impute a finding in the civil conspiracy claim up to the ODTPA. Was there any effort, I know that Telling, Telling's counsel, discussed some specific interrogatories to the jury. I couldn't tell whether that was for apportioning damages or to determine liability, but was there any discussion about Cass's insurer? Yes, what Telling's insurers did, Telling's insurers sought to intervene to ask specific interrogatories to prove their exclusions. Because, arguably, they recognized that the jury instructions in their present form would not get them there. Evanston made an affirmative decision not to do that. They decided to put all their money, all their chips, into the pot on the existing jury interrogatories. They could have asked for... Well, that's a characterization. Maybe they didn't make any decision. They did make a decision. There was deposition testimony that they knew that Telling's insurers had intervened. They thought about whether they should intervene and ask for instructions that would have proven the applicability of their exclusion, but they decided not to do so. They made an affirmative decision. Let's hear from Evanston, and we'll give you full rebuttal. May it please the Court, my name's Cliff Mash. I'm here on behalf of Appley Evanston. The Court's heard argument now from both appellants in this case. I submit to what we have here in this case is Clark Dietrich hit a home run of all home runs in the trial of this case. And after hitting the home run and getting a great result on all counts that it tried in front of the jury, Clark Dietrich is now attempting to tell this Court, don't look at the home run anymore, just look at the single. We don't want you to consider the whole record. Clark Dietrich would have this Court... Aren't they right about the stakes of this appeal? Aren't they just about getting to $3 million? No, Your Honor. Number one, that decision was not reached by the trial court. It's our position... Just to make sure we're on the same page. Our policy caps at roughly $3 million. Our policy has a per occurrence limit of $1 million and a $3 million aggregate. Our policy also has language that says all claims relating to the same act or series of acts will be considered one occurrence. So it would be our position that irrespective of the fact that we think the trial court granted the right ruling, the most at risk in our policy would be the $1 million per occurrence limit, which is eroded by defense costs. Okay, so that... Back to roughly $3 million. Roughly $3 million. Am I right about that? That's why... Between one and three. $3 million would be the aggregate. $1 million would be the per occurrence limit. I'm just trying to explain why they're going for a single and not a home run here. Oh, when I say single, Your Honor, I'm talking about the fact that they're trying to have this Court only consider one verdict as it relates to the Ohio Trade Practices Act. They don't want this Court to consider the totality of the findings on all the verdicts. Why don't you start with the association's point that strikes me as the narrowest way to think about this, at least initially, and their point that Judge Barrett looked at the intent component of civil conspiracy... Yes. ...and thought when you add that to the underlying counts... Yes. ...that had to get you to dishonesty, and they're making what seems like a fair point that not necessarily so. And I will address that, and Judge White, I think one of your questions really, really crystallizes what's at issue here. What is happening here is, with all due respect, a distortion of what civil conspiracy, the tort of civil conspiracy is. Civil conspiracy is actually a tort that takes place before the actual tort itself. As the Federal Court held in the N. Ray Welding Fumes case, it reflects the meaning of the minds where the parties reach a unity of purpose and a common design or understanding such that it preconceived plan as to perpetuate a tort. So technically speaking, the tort of civil conspiracy occurred before the CSSA actually perpetuated the torts. Let's suppose that in this trial that the plaintiffs decided to get that civil conspiracy out, and they just had a verdict on the first charge. We would have a different case in front of this Court. You would cover it. We would be in an entirely different situation. You would provide coverage. You would cover it, probably. As it relates to the scope of the verdict, I would think on the defamation claim there's a potentiality of coverage. There would be a potentiality there because defamation can be proved without actual intent. The problem that the appellants have in this case is, number one, the Court looked at the underlying findings of the individual torts. As it related to the tort of the Ohio Trade Practices Act, the jury made the determination it could have found a false statement and it could have found a misleading statement. The jury found both, a false statement and a misleading statement. Are those dishonest, or are they just? By finding a false statement, the jury made the determination that the statement was false on its face at the time it was made. Is that on count one? That was on count one. That was on the Ohio Deceptive Trade Practices Act. Wait, excuse me. You said false honesty? False on its face. Oh, on its face. At the time it was made. But somebody could be wrong about the truth, and that's not dishonest. And that's the arguments that they're trying to have this Court. It's not the arguments. It's the issue. Yeah, the issue. They're trying to say. Engage the issue. Don't just give arguments. Absolutely, Your Honor, and I apologize. My point is, Your Honor, is that the nature of civil conspiracy, civil conspiracy is predicated on the fact that somebody perpetuated a wrongful act. And the wrongful act involved actual malice. And the definition of actual malice given to the jury on the civil conspiracy count was that it was a state of mind under which a person does a wrongful act intentionally without a reasonable or lawful excuse that causes injury. That's what a jury had to find in order to determine that a civil conspiracy. As to your point, Your Honor, Judge White, the jury found that all of the underlying acts found against the CSSA, the Ohio Deceptive Trade Practices Act, disparagement, product disparagement, defamation, all of those acts were the subject of the civil conspiracy. That finding on its face reflects that the jury concluded that there was a pre-designed plan by the CSSA and other co-conspirators to perpetuate the acts of product disparagement, defamation, and. So this pre-designed plan, I'm not sure I'm understanding the mileage you're trying to get out of that. I know it's your big point. The mileage I'm trying to get, Your Honor, is simple. It's that in order for the jury to find that all three of the underlying torts were part of the civil conspiracy, by definition, by virtue of the jury instructions, the jury had to determine that each of those underlying acts were perpetuated intentionally. And the jury determined. The instruction, that's the key word. The instruction. The jury determined that the CSSA perpetuated all those acts. So the jury determined that the CSSA intentionally. You can intentionally make a statement that turns out to be false. You can't make a statement that is not dishonest if you make that act without reasonable excuse or legal justification. And that is part of the definition of civil conspiracy. And how did, was legal excuse and justification defined to the jury? Yes, and that was in the definition of civil conspiracy, Your Honor. That is part of the definition of actual malice. And what is, how was it defined, legal excuse? The definition is malice being the state of mind under which a person does a wrongful act intentionally without a reasonable or lawful excuse that causes injury. I'm asking you whether reasonable and lawful excuse was defined for the jury. It was not, Your Honor. Not specifically. But one, my point being, Your Honor, is that the definition of dishonesty that the court looked to from the dictionary and the definition of dishonesty that the court looked to from Ohio law cannot be reviewed from anything other than concluding that these acts, the underlying acts that were found to be part of a conspiracy, that were found to have been intentionally perpetuated by the CSSA without reasonable or lawful excuse, cannot be done in any other mind state than dishonest. Ohio law has equated the concept of dishonesty with a conscious wrongdoing. Okay, with a conscious wrongdoing. Correct. So if you, if sometimes people get themselves into a frame of mind where they really believe something to be true and everybody around them can see that it's not true, but they, you know, they think it's true. So if you have that situation, which, I mean, this person, I don't know who it is, but was given a chance to get out of the lawsuit with no payment whatsoever. Correct. But somehow believed so much that the statements were true that he didn't take advantage of that opportunity. Well. So if you have somebody with that frame of mind. And two points, Your Honor. Number one, and you raise a good point, the CSSA is not a person. The CSSA is not a separate individual that makes these decisions. The CSSA is a trade association. Incorporated or just an association? It's a trade association. And it's a trade association made up of the same conspirators that Clark Dietrich sued, Marina Ware, Telling, the other one. All three of these are made up of, and Clark Dietrich argued at the trial, and Clark Dietrich argued when they convinced the trial court to set a receiver, that it's a sham organization. It is merely a vehicle by which these corporate members perpetuated these intentional acts to harm Clark Dietrich. That's the argument. That was the pitch that they made before the trial. So it's not like the CSSA is an individual that may have had different thoughts. And to address your other point, Your Honor, as to why Clark Dietrich or why the CSSA decided to go forward with this case, it's our position and belief that the CSSA was a shell entity. It had no assets. The only asset the CSSA had was an insurance policy. So from the CSSA standpoint, there was no real risk. This is a digression. I'm asking about somebody who has convinced themselves that this is true, that there was something about the product that was deficient. Is your answer that it's an entity that doesn't have such thoughts? Is that what you're trying to say? That seems like a really nice thing to say from your perspective but can't be right. My answer is it was a risk where they were risking nothing. What did the CSSA have to gain with the verdict? They could have gotten a verdict that would have determined that Clark Dietrich's product was not code compliant. What was the downside? They had no assets. The only asset was an insurance policy. All the individual defendants had settled out in insolvency. What about the point that in construing the word honesty, I guess I've got two points. One, we have to read the exclusion narrowly, but the double point here is the policy is supposed to cover unfair competition, defamation, disparagement, and you're pushing your definition of dishonesty to the point where you have to ask yourself, is there a way to commit unfair competition, defamation, disparagement honestly? And you find yourself thinking, well, what a beautiful policy to issue. You get premiums with no risk. Had civil conspiracy not been part of this case, we would be having a completely different argument. But you can't undo what they've done. So try to answer the question directly. Yes. The question is you're diluting dishonesty, and at some point it gets you very close to the honest disparagement, the honest unfair competition, and we have to honor those. There has to be a gap between those or this is a ridiculous policy. It is, and I will try to address your point directly, Your Honor. This policy provides various types of coverage. My point is when we look at the verdict, we have to look at the totality of all the factual determinations by this jury. One of the determinations that the jury made, the one that they're all trying to distance themselves from, was that the CSSA did all of the underlying acts which they are found to have performed, and they did it intentionally, and not only did they intentionally perform the wrongful act, but they did it without reasonable excuse or justification. My point is one cannot act intentionally to perpetuate a wrongful act, knowing that the wrongful act was in the furtherance of a conspiracy, knowing that the wrongful act would ultimately harm the other party. A person cannot do that without knowledge that it is a dishonest act, and there was no reasonable or legal justifications for his act. My point is... Can you answer my question from before? It's related to this. How do you have to have a dishonest frame of mind to do that? I mean, yes, you're intentionally making these statements. You're making them knowing that there's going to be a consequence for the subject of the statements, and all of you agree to do this, so it's definitely a plan with intent, but you also believe mistakenly... Because in looking at the determinations on some of the underlying counts, the jury determined on the Ohio Deceptive Trade Practices Act that the statement was made falsely, and it was false at the time it was had. And the jury determined with respect to the disparagement claim... False equals dishonest. On the disparagement claim, Your Honor, the jury likewise determined that it was either... Back to my point before. That it was either, on the disparagement claim, Your Honor, the jury had to determine that it was either knowingly false or made with the knowledge that in probability it was untruthful. Reckless. That's beyond reckless. In probability that it's untruthful is beyond reckless, and that is a finding that the jury made as it relates to the product disparagement claim. So all of these claims, all of these findings, become part of the conspiracy. All of these findings are determined to have been performed intentionally, not only intentionally, but also performed without legal or justifiable excuse. The totality of this gave the trial court a sufficient basis to determine the dishonesty exclusion. And it's also important to recognize, Your Honor, that the dishonesty exclusion applies to all claims arising out of or are part of dishonest conduct. Again, conspiracy is a preconceived plan to perform acts. The jury found that the person who performed the wrongful acts was the CSSA. Each of the wrongful acts. This isn't a case where the jury didn't find that the CSSA didn't do one of the acts and found that act was part of the conspiracy. All of the acts. And there's one other point. Well, go ahead. I just want to make sure I'm understanding. No one likes to talk about hypotheticals that deal with the terms of a defeat, but what would happen if the other side is right? So folks on the association's argument, they say, we didn't move for summary judgment. The question here is whether my friends on the other side deserve summary judgment. And then this leads to the question, okay, wait, maybe they're really – is a tribal issue a fact? Is there a tribal issue a fact in this case? Or would you concede that one side or the other has to win as a matter of law? Because we're not going to have a – we're not going to reseat the jurors and have some discovery as to what they really meant. We're not, but a different jury could make that same determination. So you'd have a new jury trial about – you'd redo the jury trial to see what you would find. Is that your theory? And to bring up the same evidence that Clark Dietrich has convinced the trial court as to why it should appoint a receiver because the CSSA is a sham organization that couldn't even – No, no, no, I'm focused on – Yes, I apologize. Yes, stick with the – I apologize. Back to the point. You think there should be a new jury trial as to whether they would have found dishonesty with different jurors? I think in the jury verdict that forecloses us from having the opportunity to do so. If this court were to disagree that the trial court didn't have a sufficient record in front of it in order to apply the dishonesty. Based upon your argument, the other side would just forget about the conspiracy part of the trial. Then it wouldn't be there. Yes. And you wouldn't be able to raise it. And the FDIC case that we pointed to this court, I think is a very important case for this court to consider. In that case, a party tried a legal malpractice case and a breach of fiduciary duty case. And when it came to the coverage case, after they won on both counts, they said, well, there's coverage in the legal malpractice case. And the Fifth Circuit said, you can't un-ring the bell. You can't un-rot what you did. You chose to pursue both claims in front of this jury. When the jury determined that there was a breach of fiduciary duty, that fit within the dishonesty exclusion in the policy. You can't separate the claims out for coverage purposes. You look at the determinations made by the jury. What's your answer to Clark Dietrich's double damages point? Again, I would submit it's a misconception of what civil conspiracy is. The jury made the determination of damages on all three counts. And I agree with Clark Dietrich that the damages were separated out. The jury determined that Clark Dietrich was responsible for 15% of one of the torts and 35% of the two other torts. Civil conspiracy does not give rise to new damages. It's not additional damages. What civil conspiracy does is it makes co-conspirators responsible for the proportionate share of the other co-conspirators. So what the jury did was, when it found civil conspiracy, it held the CSSA liable for the full amount of damages for all the torts that it found against the CSSA. That's what the determination was. At the end of the day, it doesn't make a difference as to what the jury found as to each of the underlying cases. And why doesn't it make a difference? Because whatever it was, that was the wrongful conduct that the jury found was the subject of the conspiracy. Because it found the CSSA perpetuated all the wrongful acts, and because it found that all the wrongful acts were part of the conspiracy, the jury determined that whatever it found as it relates to defamation, Ohio trade practices, product disparagement, whatever it determined, that was the subject of the conspiracy. It found all three. And because it found all three, the jury logically concluded that the CSSA intentionally committed all those wrongful acts. And with the totality of those findings, with the findings as it relates to the underlying individual acts, including the finding on the product disparagement claim, that it was done with knowledge of falsity or knowledge of probability of falsity. That was the determination the jury made. Because you both had different explanations for the verdict on the civil conspiracy. Was it $19.5 million or $16.5 million? It was $19.5 million. Okay, so that was a typo. It was $19.5 million. So you're saying that if you add up all of the damages that had been apportioned in the first three counts to the other parties, that comes to $9.5 million. What I say is, Your Honor, the jury found $10 million on each of the underlying torts. It found $10 million in the Ohio Trade Practices Act. It found that the CSSA was 35% responsible, so they were responsible for $3.5 million. The jury found $10 million in defamation. They found the CSSA was 35% responsible, so that was another $3.5 million. And the jury found $10 million in product disparagement. They found that the CSSA was 35% responsible, 3.5. So on the three underlying torts, the jury determined that the CSSA was responsible for $11.5 million. On the civil conspiracy, the jury determined that the CSSA was responsible for $19.5 million. If you add $19.5 million plus $11.5, you get the $30 million that they awarded in the underlying torts. So the answer to my question is yes? Yes. Okay. I'm sorry, Your Honor. Okay. Well, I think your time is up. Are there any other questions? All right. Thanks so much. First, if I could just answer Judge Seiler's question, and I'm pretty sure this is in the record in this case. The CSSA is a Delaware not-for-profit corporation, Your Honor. The civil conspiracy doesn't do all the work that Evanston wants it to do. And you can look at the instruction. Whatever the law is on civil conspiracy, I submit is not relevant here because what's relevant is what was the jury in Butler County instructed and what were they deciding. The instruction is real simple. I'm going to read it. The jury had defined that defendant CSSA participated in a malicious combination involving two or more persons, including the defendant, a result of which was the commission of a wrongful act that caused injury to plaintiff. You go over in the court-defined malice as the state of mind under which a person does a wrongful act intentionally without a reasonable or lawful excuse that causes injury. Under those instructions, you could hypothetically have a conspiracy to commit a battery that involves no falsification at all. I pay Mr. Seiler $50 and say, would you please go hit Mr. Mase? That'd be a conspiracy to commit a battery. There's no falsification. There's no dishonesty here. You've got to look at the underlying wrongful acts to get the dishonesty. Now, with all due respect to Mr. Mase, he said that the jury had defined probability. Well, that's not what they were on the defamation and disparagement claims. That's not what they were told reckless disregard was. That was part of it. But the instruction on reckless disregard goes on to say that the jury could find reckless disregard or it, the CSSA, entertained serious doubts as to the truth of the statement. Now, that is, I respectfully submit, not dishonest conduct. It's culpably bad judgment, but it's not the kind of willful misrepresentation that we get in the concept of dishonesty. Again, this is an insurance policy. If the intention of the policy, and Judge Sutton raised a good question of how would this, how would this, what would this policy cover? But if the intention in the exclusion was to eliminate intentional conduct or reckless conduct, those are common terms. They should have said it. The phrase dishonest, deliberately false, deliberately fraudulent, excuse me, or criminal is an impermissibly indirect way to get to the result they're trying to get. Is there a case out there that has unfair competition, defamation, disparagement, which has this dynamic of a dishonesty exclusion, which requires you to figure out how do you commit those things honestly? Your Honor, in all honesty, if there was, I was unable to find it. All right, all right. Well, just be, spare us some work. I wish there had been. So that's it, Your Honor. We don't know. The jury could have found dishonesty, but it could also have found reckless conduct not amounting to dishonesty. And you don't get over that hump by saying, well, it's a civil conspiracy, because the instructions of civil conspiracy don't go to that issue. Thank you, Your Honors. Very briefly, Your Honors, on the double damages point, you just heard a calculation of $19.5 million, which would violate the prohibition on awarding duplicate damages. Because what you heard is that the jury awarded $30 million. They subtracted out $19.5 under this allocation theory, and then they re-awarded the $19.5 under civil conspiracy. They were not permitted to do that. So you have to find a different reason, a different basis for the $19.5. In our brief, we suggested that it was for future damages, because we had an expert that precisely picked that number, caused by statements made in the tech note. So all of that flows consistently. On the point of dishonesty, Ray's correct. The instruction was that the jury had to find that there was an intentional act. That was it. It was just an intentional act. No culpable mental state at all in order for the civil conspiracy to arise. Not every intentional act is dishonest, and not every intentional act can bar insurance companies. Can I just – one really quick question, which maybe my colleagues have asked, and I just didn't appreciate the question or the answer. But if this case had only been about – I don't care which one it is, but just say unfair competition just to pick one of them. And the same double damages prohibition was in the instructions, and you had one count unfair competition, count two conspiracy to commit unfair competition. Would the double damages prohibition have prohibited separate damages for the civil – excuse me, the conspiracy part of unfair competition? Just yes or no, and then if you want to qualify or explain. But yes or no. I understand your question. I think the answer is yes because the way you've – It would prohibit it. So you've got one count unfair competition, second count conspiracy to commit unfair competition, and the exact same double damages prohibition instruction as we have here. You're saying you couldn't have awarded separate damages for the conspiracy to commit unfair competition. You could not? No, you can award separate damages. I misunderstood the question. You couldn't? Yes. Okay. All right. That's all I wanted to know. With respect to – you had asked some questions, Judge, about the tech note and how that could be a basis for liability. When the trial court entered the directed verdict prohibiting us to make that claim against just the CSSA, the trial court said that in terms of the motion for directed verdict as to the tech note and another publication, the court is going to grant a directed verdict to the defendants with respect to all causes of action with the exception of civil conspiracy consistent with the discussion. But we were permitted to argue to the jurors. So I always tell my students of appellate advocacy that the best way to start a point is by referring to something a judge has said because then you're forcing the other judges to interrupt a colleague as opposed to you. It's brilliant. But you had ten minutes extra before, and your excellent advocacy is not going to allow it to keep going. So thank you very much. But if you have a question, yes, that's great. Go ahead. Just finish answering. I think you were addressing a question of mine. Yeah. I think what I was saying is so that the trial court permitted us to argue to the jury that the civil conspiracy could be based on the publication of the tech note. And if that's what the jury said, that was completely different than the damages awarded on the other three counts because they were limited to statements in the CSSA publication. That's how I get to this verdict as being, well, you just simply can't tell. Thank you for your indulgence, Your Honor. Thanks to all three of you for your excellent briefs and oral arguments. Thanks for answering our questions, which we always appreciate. The case, yeah, thank you. The case will be submitted, and when the time allows, the clerk may call the next case.